**IN THE COURT OF APPEALS OF IOWA**

No. 24-1688
Filed March 5, 2025

**IN THE INTEREST OF M.S.,**
**Minor Child,**

**A.F., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

        The mother appeals the termination of her parental rights.  **AFFIRMED.**

        David R. Fiester, Cedar Rapids, for appellant mother.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

        Julie F. Trachta of Linn County Advocate, Inc., Cedar Rapids, attorney and guardian ad litem for minor child.

        Considered by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

The juvenile court terminated the mother's parental rights to M.S., born in 2021, pursuant to Iowa Code section 232.116(1)(h) (2023).[1] On appeal, the mother challenges the juvenile court's conclusion the statutory ground was proved, arguing M.S. could have been returned to her custody at the time of the termination trial or, alternatively, that the Iowa Department of Health and Human Services (the department) failed to make reasonable efforts at reunifying her with the child. She also argues that the loss of her rights is not in the child's best interests because of the bond the two share.[2]

**I. Background Facts and Proceedings.**

M.S. is a child with physical challenges and developmental delays; he has diagnoses of cerebral palsy, spastic quadriplegia, and chronic bronchopulmonary dysplasia. Before the department became involved, the mother was M.S.'s sole caretaker; the father did not provide care for M.S. and was not adequately informed of his needs to be able to do so.

---

[1]In separate proceedings, the juvenile court also terminated the mother's parental rights to M.S.'s sibling, L.S. The juvenile court held separate termination trials and issued termination orders at different times. The mother appealed the termination of her rights to each child. We also file a ruling regarding the mother's rights to L.S. today. *See In re L.S.*, No. 24-1738, 2025 WL _____, at *_ (Iowa Ct. App. Mar. 5, 2025).

[2] According to the termination order:

> The father [was] very consistent throughout the case in his belief that [M.S] needs more care than he is able to give due to [M.S.'s] diagnoses. It is clear that [the father] loves [M.S.] and he visits him weekly with [M.S.'s] sister (who is placed in the care of her father). However, he believes that [M.S.] is flourishing where he is and wants him to stay there.

The father consented to the termination of his parental rights. *See* Iowa Code § 232.116(1)(a). He does not appeal.

In March 2023, the department received a report alleging that while M.S. was in the hospital being treated for dehydration and electrolyte imbalance, the mother injected him with unprescribed insulin. According to the department's request for emergency removal:

> Dr. Irene Morcuende, a resident at the University of Iowa Hospitals and Clinics explained that they were doing an EEG for [M.S.], which includes constant video monitoring. [M.S.] was experiencing episodes of hypoglycemia, so they reviewed the video tape. [It] shows that on 3/14/2023 at approximately 9:15 am, [M.S.] was crying, and the [mother and her boyfriend] were at his bedside. He had an IV in his left arm. The mother did something with it. She asked the nurse about something when the nurse came in. The nurse went to do something. The mother and the boyfriend went into the bathroom together. When they came out, mom was holding a needle. The video set up did not allow them to see [M.S.'s] lower body. Mom's back was blocking the video. However, it appears that mom unwraps a needle, takes the cap off, draws something up into the needle. Then, at 9:17 am, [M.S.] started to cry immediately as if something had been injected into his body. Mom can then be seen capping the needle, then walking out of the camera range.
> Dr. Mahil Rao, the staff physician, explained that he informed [the mother] that the hospital has a "high suspicion" that someone has been injecting [M.S.] with insulin. He said that her reaction was to become a "bit tearful," but she did not say anything else about it. The hospital put a one-on-one staff in the room on 3/16/2023. Dr. Rao stated that [M.S.'s] blood sugars have been stable since about 10:00 pm on 3/16/2023.
> Dr. Roy Zhou, a physician with the University of Iowa's Child Protection Team, analyzed [M.S.'s] test results. The Endocrine Team has also reviewed his test results. *They are medically certain that [M.S.] had been getting injections of a man-made insulin.* He explained that [M.S.] had high levels of insulin, but low levels of C-Peptides. He said that can only happen if insulin is being injected. He diagnosed [M.S.] with "Fictitious Hypoglycemia." Their team has concerns regarding the mother being the sole caretaker for the child. They are concerned about "Medical Abuse by Proxy."

(Emphasis added.)

An investigative social worker spoke with the mother on March 17. The mother initially denied giving M.S. any medication or injections during his hospital

stay. During the same conversation, she changed her statement, saying she gave him some of his prescribed medications through his feeding tube. The mother reported that nurses would get the medications ready and then she administered them; she told the social worker that the nursing staff would be able to verify this. She explained that she carries syringes with her and said she may have filled one with water to inject into his feeding tube to push medication or unclog the tube— she stated she may have done that without notifying any medical staff.

When the social worker spoke to hospital personnel, they agreed that it was possible a nurse would prepare a medication and then allow the mother to administer it. However, at the time the video showed the mother injecting M.S., no nurse had prepared or approved an injection.

On March 20, the mother admitted to the social worker that while M.S. was in the hospital, she gave him an injection that was not approved of or prepared by nursing staff. The mother maintained that it was a steroid M.S. is prescribed (Solu-Cortef) and that she gave him the injection because nursing staff informed her the hospital was experiencing a shortage of it. The mother could not remember what day she gave M.S. the injection; she denied having access to insulin.

Also on March 20, M.S. was removed from both parents' custody while he remained a patient at the hospital.[3] The department also sought removal of L.S.— M.S.'s older sister—from the care of the mother; L.S. was allowed to remain in the father's custody and was placed in his care.

---

[3] The father informed the department that he was unable to provide M.S.'s care because of the child's special needs.

On March 21, a nurse told police officers—who were conducting their own criminal investigation into the allegations—that she previously found an insulin pen in M.S.'s bed. The nurse claimed that the mother said the needle was hers and took it from the nurse.

The same day, the investigative social worker spoke with the mother's boyfriend. The boyfriend had previously denied being aware of the mother giving M.S. medication in the hospital and stated he "always advised" her to allow the nurses to do it. The boyfriend changed his story; he told the worker that the mother got permission from a physician to give M.S. a shot of the steroid and admitted he was present when she administered an injection. The boyfriend said they brought the medication with them from home after hearing there was a shortage.

Department personnel, the mother, and members of M.S.'s medical team from the University of Iowa met on March 30, 2023. The mother came prepared with several questions about other explanations for why M.S. had high levels of insulin with low C-peptide levels. According to the department's social investigation report assessment:

> The team of doctors and social workers reviewed the questions. All medical professionals present at this meeting stated that none of these concerns, presented by [the mother], would explain the high insulin levels and the corresponding undetectable C-peptides. They all agreed that the[] only way for [M.S.] to have the insulin and C-peptide levels that he had, was for someone to be giving him an outside source of insulin.
> They explained that Insulin and C-peptides go hand in hand. They explained that it [is] like taking a stick and breaking it in half. One of the halves would be insulin—the other would be C-peptide. Basically, the levels should almost be at a one to one ratio. [M.S.'s] levels were way off. The diagnosis that they have given is Fictitious Hypoglycemia. The team also believes that [M.S.] received multiple doses of insulin to be affected as he was. They believe that they can confirm that exogenous insulin was given to [him]. The person that

had access to him at most times was his mother. They also stated that a nurse found an insulin pen in [M.S.'s] bed on level 10—after he had been transferred to the PICU [when he experienced the hypoglycemic reaction]. The nurse stated that when the nurse asked what it was, [the mother] claimed that it was hers. [M.S.] has 2 medications that come in a pen. He has a Gvoke and his HGH that come in a pen. However, the description of the pen does not match what the nurse found in [M.S.'s] bed.

The team also stated that the protocol for outside medications is for them to be logged in and documented. Staff would then give the medications. They also confirmed that there was no shortage of Solu-Cortef or other steroid medications. [The mother] would not have been told that there was a shortage. Also, Solu-Cortef is not a scheduled medication. It is given as needed. Dr. Rao said that he would not have given permission for [the mother] to give [M.S.] a shot—and did not give her permission to do so.

They stated that [M.S.'s] low blood sugar levels completely resolved after one on one staffing was implemented for [M.S.] This meant that a hospital staff was in the room any time that [the mother] was with him.

In later discussions with police officers, the mother maintained that she had given M.S. one injection while he was in the hospital and that it was the prescribed steroid—not insulin. When confronted with the fact that the hospital was not low on the steroid, the mother said a nurse told her they were. The mother admitted that she followed the hospital's procedure of checking M.S.'s other outside medication into the hospital pharmacy; she could not explain why she would not have followed the same procedure for the steroid. The mother told the officer she kept the steroid with her so she could "continue doses as they'd been given at home." The officer suggested that if the mother thought the hospital did not have the needed medication, it would make more sense for her to check it in to the hospital pharmacy—so it could be administered to M.S. even if the mother was on a walk, which she sometimes took. The mother responded she would not have left M.S.'s room when he needed the medication, but the police officer reminded

her that the steroid was prescribed "as needed"—it was not given as a scheduled dose. In other words, the mother could not anticipate when M.S. would need an injection of the steroid. The officer also asked the mother about the needle device found in M.S.'s bed after he was transferred to another unit; the mother seemed to admit the needle was hers but stated it was a "poker" that she used to prick M.S. for blood sugar tests. She stated it came with his glucometer and was not an insulin pen. After the police officer went back and spoke to the nurse again, the nurse reaffirmed that what she found was a "medicine pen"—not a poker. She reported that she twisted the dial, pushed a button, and medicine came out of the needle.

Based on its investigation, the department issued a founded child abuse report. And the mother was criminally charged with two felonies: child endangerment causing serious injury and administering harmful substances.

Throughout the department's involvement with the family, the mother maintained she did not inject M.S. with insulin. She similarly repeated this denial to the mental-health professionals who conducted evaluations of her. As a result, in July, the juvenile court authorized the department to release some information surrounding its investigation of the March incident to the mother's future evaluators. The mother obtained at least one additional evaluation after the court's order, but she did not tell the department beforehand, so the department's information was not shared with the person performing the evaluation.

The mother received mental-health diagnoses of unspecified depressive disorder and unspecified anxiety disorder. She was not diagnosed with factitious disorder imposed on another (formerly referred to as Munchausen syndrome by

proxy).[4]  The mother participated in cognitive behavioral therapy, but there were concerns it was not addressing any root problems—the mother reported to the guardian ad litem (GAL) that her therapist made statements that she did not know how the mother kept going with the stress of the department's involvement and suggested the mother watch a documentary about a young girl whose parents were wrongly accused of medical abuse.

The mother had fully supervised visits with M.S. until November.  In the lead up to the permanency review hearing, the department and GAL each filed reports raising concerns about the mother's continued interactions and involvement with M.S.  In the GAL's November 1, 2023 statement to the court, she stated:

> This case was opened due to [the mother] medically abusing [M.S.] and forcing him to undergo unnecessary medical procedures. Even with [M.S.'s] removal from [the mother's] care and services in place, this is still a concern.  [M.S.] must undergo a sleep study at the CDD in Iowa City due to her continued influence.  [The foster mother] reports [the mother] continues to control what medical supplies [M.S.] receives . . . .  [The mother] controls what medical equipment or therapy equipment is purchased through insurance,

---

[4] "Factitious disorder" is defined as:

> a psychological disorder that is characterized by the intentional feigning, exaggeration, or induction of the symptoms of a disease or injury in oneself or another and that is accompanied by the seeking of excessive medical care from various doctors and medical facilities typically resulting in multiple diagnostic tests, treatments, procedures, and hospitalizations.

*Factitious disorder*, Merriam-Webster, https://perma.cc/W64Z-M7YV.  As stated in the note to the definition:

> Factitious disorder typically involves self-imposed actions and the disorder may also be referred to as factitious disorder imposed on self or especially formerly as Munchausen syndrome.  Less frequently, a person's actions are directed towards inducing symptoms in another individual (usually the person's child).  In these cases, the disorder is typically referred to as factitious disorder imposed on another or especially formerly as Munchausen syndrome by proxy.

*Id.*

and some of these items are expensive and can prevent [M.S.] from being able to access other therapy equipment for years due to the cap on funding. [L.S.'s] play therapist reports she is very concerned about [L.S.'s] emotional and mental well-being, and the impact ongoing contact with [the mother] is having on her. When visits with [the mother and L.S.] were suspended for three weeks, [L.S.] was noted to be calmer and more well-adjusted. When visits resumed, she immediately displayed acting out behaviors. Even with a provider and nurse present, there continue to be concerns during visits. The children are giving direct signs of their discomfort during visits and interactions with [the mother]. It is not in their best interest to continue to force them to have interactions with [the mother].

In its November 3, 2023 permanency review order, the juvenile court temporarily suspended the mother's visits with M.S. pending a later contested hearing. The court also suspended the mother's right to attend M.S.'s medical appointments or make medical decisions for him.

The contested hearing took place on December 11 and 18.[5] In its written ruling, the court suspended the mother's visits, concluding they were "clearly harmful to the children." The court explained:

Visits between the mother and the children have remained fully supervised throughout this case. Visits were suspended in the fall for approximately three weeks after [L.S.] had brought a medical syringe and a tube of medical grade lubricant home from her mother's house after a visit. Thereafter, visits have been in the community or the provider office. On November 2, 2023, the Court again suspended visits pending contested hearing due to concerns for the children's physical, mental and emotional health. [The daycare director] where [L.S.] attends daycare, testified that [L.S.'s] behaviors changed after visits with her mother resumed. [L.S.] was exhibiting disruptive behavior, was obstinate, and was not sleeping during naps. [L.S.] was also having accidents (not making it to the bathroom) when visits were occurring. It would take her two to three days to regulate once she had a visit. [The daycare director] noted that since the visits have been suspended again, her behaviors have stopped. In fact, the day after visits were suspended, [L.S.] slept through her nap and was cooperative the whole week. [L.S.] had

---

[5] We do not have a transcript of this proceeding.

also told her in October that she didn't see her mom all the time because her mom had hurt her and her brother and it "made her sad."

[L.S.'s] play therapist, Kim Korte, testified that she has been seeing [L.S.] weekly since August. She unequivocally recommended that visits between [L.S.] and her mother stop at this time. She noted that in sessions, [L.S.] can become quite distressed exhibiting trauma responses and is either numb or hyper and silly. She has displayed avoidance, emotional dysregulation, high anxiety and high stress. [L.S.] has a pattern of "feeding" baby dolls with a bottle that she says is hot sauce, pee and poo, then says it's a "secret" and shuts down. On one occasion, [L.S.] said that her mom hurt her brother, then shut down and wanted to end the session. Ms. Korte saw a lot of distress and emotional dysregulation at that time. Notably, she has noted a change in [L.S.] since visits have been suspended again. She testified that [L.S.] is now calm and regulated and has been very happy and bright. Ms. Korte recommends that [L.S.] be allowed the opportunity to work through her trauma without visits so that she is not further traumatized until she has processed the trauma. She believes that the mother needs to be in therapy at the same time so that she will then be able to provide [L.S.] what she needs emotionally and physically. Ms. Korte recommended that once [L.S.] has addressed her trauma, therapy with mom should occur to ensure that she is ready to meet [L.S.'s] needs, then they should begin family therapy. It would be detrimental to force [L.S.] to have visits at the time and would damage her trust in adults. [L.S.] cannot heal if she doesn't feel safe.

[The department case manager] testified that at a visit she attended, mom was very controlling and wouldn't let [M.S.] be interactive. She noted [M.S.] had a very flat affect with his mom. It was very concerning to her that the mother chose to feed [M.S.] a hot dog when it was not on the list of foods that he could have especially given that his diet was very "liquid-y" at the time with only pureed foods being given. [The case manager] testified that the mother also interferes with the child's physical therapy and occupational therapy appointments. The mother checks [M.S.'s] "my Chart" [online medical chart] multiple times a day and thinks that the doctors are withholding information from her. Further, the mother has scheduled both children for medical appointments and tests that have been unnecessary.

[The case manager] also relayed an interaction she had with [L.S.] in which [L.S.] threw a Care-bear against a wall stating, "mommy [mother's name] hurts babies." After visits were suspended then reinstated, the mother was not allowed to take [L.S.] to the bathroom alone after [L.S.] stated that her mother wiped her too hard and she was sore in her private area. [The case manager] recommended that the mother's visits remain suspended and also testified that [M.S.] is blossoming since visits have been suspended.

The mother also testified. The Court found the mother had an answer for all of the concerns that had been brought forth but did not find these explanations to be believable. In fact, the Court is very concerned that the mother has absolutely no insight into the concerns presented. The actions of the mother in many instances have put her children in danger, especially [M.S.] who has many special needs. It appears to the Court that the mother seeks attention through her medical needs and those of her children, whether real issues or those brought to medical professionals solely by mother's report. She is placing her children in danger through those actions as well as the behavior described by [the case manager] and alluded to by [L.S.] in daycare and in therapy sessions. Most important, the testimony by Ms. Korte and [the daycare director] was incredibly persuasive in determining that [L.S.] is experiencing emotional and mental harm from visits with her mother.

Visits remained suspended through the termination trial, which took place over two days: January 19 and February 6, 2024.

At trial, the mother maintained she did not inject M.S. with insulin. Her criminal charges were still pending. She testified she appealed the founded child abuse report, which was also still pending. When asked about what happened in M.S.'s hospital room on March 14 and to explain the inconsistent statements she had given since, the mother testified that the video from M.S.'s hospital room showed her taking M.S.'s rectal temperature—not giving him an injection. The following exchange occurred on direct examination:

Q. You had previously told other folks that you gave [M.S.] a shot of a steroid? A. Yes, but that was not what was in the video.

Q. So are you saying you gave him a shot that was not approved by medical professionals that was on a different day the hospital's not even aware of? A. It's not—it was that morning but before the video, and it's not that—it's not a medication that wasn't approved. It was a medication that was prescribed by the doctors.

Q. But as was noted in the reports, you did not check that medication into the pharmacy like you did the other two medications that you checked? A. I—the hospital was aware that I had brought that medication because I had had that conversation with the doctor. I'm not sure what the hospital protocol is in that situation, but if somebody had asked me for it, I would have given it to them.

Q. But I think you do know the protocol because you did check two medications into the pharmacy, but you did not check the steroid into the pharmacy. A. I gave them the medications they asked for. . . .

From the time of M.S.'s removal from the mother's custody, M.S. had not experienced any issues with his blood sugars. He was thriving in the care of the foster parent—his mobility and speaking were improving, and he had experienced generally good health.

The juvenile court did not issue its termination order until October 2, 2024. When it did, it concluded M.S. could not be returned to the mother's custody and termination was in the child's best interests, ruling:

> [M.S.], age two at the time of trial, has been out of his parent's care since March 20, 2023. Services to work toward reunification were available to the mother. While the mother did cooperate in mental health services, she did not allow the evaluators to have the appropriate information to ensure that her mental health issues were diagnosed appropriately. Even during fully supervised visits, the mother continued to place the child in danger through the foods she attempted to feed him, medical items accessible to him and his sibling, and continued attempts to give him medications even after ordered not to do so. Further, she continued to push medical professionals to schedule unnecessary medical tests for the child and also continued to purchase unnecessary medical equipment for the child. [The mother] often portrayed herself as a victim in this case when in fact she had victimized her son. The mother cannot be considered a safe placement at this time or any time in the reasonable future. There have been no trial home placements.

The court ruled termination was in M.S.'s best interests and granted the State's petition to terminate the mother's parental rights pursuant to section 232.116(1)(h).

The mother appeals.

**II. Standard of Review.**

"In termination-of-parental-rights cases, we review the proceedings de novo." *In re R.M.-V.*, 13 N.W.3d 620, 624 (Iowa Ct. App. 2024) (citation omitted).

"We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

**III. Discussion.**

The juvenile court terminated the mother's parental rights to M.S. under section 232.116(1)(h), which allows termination when all the following occurred:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother challenges only the fourth element—whether M.S. could be returned to her custody at the time of the termination trial. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpreting "at the present time" to mean at the time of the termination trial). As part of this challenge, the mother argues the State failed to make reasonable efforts to return M.S. to her custody and points to the suspension of her visits with the child. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent."); *In re C.G.*, No. 23-1234, 2024 WL 260926, at *1 (Iowa Ct. App. Jan. 24, 2024) (recognizing that "[a]t its core, a parent's reasonable-efforts challenge functions as a challenge to a component of the statutory grounds").

We understand the mother's "reasonable efforts" argument to be an assertion that the court wrongly allowed the department to suspend her visits with

M.S. in November 2023, which negatively impacted her ability to reunify with the child leading up to the termination trial. The mother resisted the department's request to suspend her visits and participated in a contested hearing on the issue. As far as we can tell, she never framed the issue as involving "reasonable efforts," but we think she did enough to preserve error on the claim.

Still, we cannot reach the merits of the mother's argument that the juvenile court was wrong to suspend visits because we do not have a transcript of the contested hearing. Without it, we cannot review the evidence upon which the juvenile court made its decision. "If the appellant intends to argue on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the record on appeal must include a transcript of all evidence relevant to such finding or conclusion." Iowa R. App. P. 6.803(1). "It is the appellant's duty to provide a record on appeal affirmatively disclosing the alleged error relied upon." *In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005). And the failure to provide the record prevents us from deciding in the mother's favor on this issue. *See id.* at 135–36.

While bypassing the mother's reasonable-efforts challenge, we consider whether the State proved M.S. could not be returned to the mother's custody at the time of the termination trial. The mother notes that she followed court orders, obtaining mental-health and psychological evaluations and participating in therapy as required. She complains that, despite this, the court and the department decided she was unsafe because she refused to admit to her treatment providers that she injected M.S. with insulin. She suggests this is a violation of her constitutional right against self-incrimination. *See* U.S. Const. amend. V. But this

argument fails. First, the mother never invoked her Fifth Amendment right; she has steadfastly maintained she did not inject M.S. with insulin (even while her explanation of what the video shows varies). And second, even if she invoked the Fifth Amendment, that does not free her from the consequences that follow for failure to take responsibility for her actions. *See In re R.B.*, 832 N.W.2d 375, 378 (Iowa Ct. App. 2013) ("[T]he government need not make the exercise of the Fifth Amendment privilege cost free." (alteration in original) (citation omitted)). While "[t]he State may not penalize [the mother] for noncompliance with a court order impinging on [her] right against self-incrimination," "this is as far as the Fifth Amendment privilege extends." *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002). "A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." *Id.* "[T]hese consequences lie outside the protective ambit of the Fifth Amendment." *Id.* (citation omitted). The mother may have been faced with a dilemma regarding whether to speak honestly with her treatment providers, but that dilemma does not trigger constitutional protection. *See id.*

While the mother attended therapy, she did not complete any treatment to address the underlying issues that led to department's and juvenile court's involvement with the family. We view the conflicting version the mother presented over the medical problem involving the injection of insulin as one factor in our analysis. So, M.S. could not safely be returned to the mother's custody at the time of the termination trial. *See id.* at 151 (finding that because the father "fail[ed] to complete any form of treatment, we cannot conclude [he] has fixed his problems and is now fit as a parent"); *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988)

(noting "the requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs"); *In re E.S.*, No 23-0544, 2023 WL 3335326, at *2 (Iowa Ct. App. May 10, 2023) (affirming termination of parental rights when children were removed from father's custody after a child protective assessment found the father sexually abused an older half-sibling and the father "completed mental-health and psychosexual evaluations [but] did not follow through with the recommended intensive treatment and continued to deny the abuse occurred").

Next, the mother argues termination of her parental rights is not in M.S.'s best interests. In making this determination, we use the structured best-interests framework provided in Iowa Code section 232.116(2). *See In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010) (requiring the court to "base its best-interest determination on the legislative requirements contained in section 232.116(2), rather than upon the court's own value system"); *see also* Iowa Code § 232.116(2) (requiring the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child"). "[A] child's safety and his or her need for a permanent home [are] the defining elements in a child's best interests." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted). And we consider "the child's long-range as well as immediate interests." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (citation omitted). The mother cannot provide M.S. with the safe home that he needs and deserves. While the mother participated in some therapy during the more than ten months between when M.S. was removed from her care and the termination trial, she did not address the issues that led to

department involvement.  By the end of the termination trial in February 2024, M.S. had been removed from the mother's custody for more than ten months and had not seen the mother in more than three months.  He was thriving in the home of his foster family, reaching new developmental milestones and experiencing fewer medical issues.  Termination of the mother's parental rights is in M.S.'s best interests.

Finally, the mother argues we should forego termination because there is clear and convincing evidence that the loss of her rights would be detrimental to M.S. due to the closeness of the parent-child relationship.  *See* Iowa Code § 232.116(3)(c).  The mother recognizes that the bond between her and M.S. had suffered by the time of the February 2024 termination trial due to the suspension of visits.  But she suggests that because those visits were wrongly suspended, we should not discount the bond they shared earlier in M.S.'s life, when the mother was the sole caretaker of the high needs child.  As the parent resisting termination, the mother has the burden to show application of this permissive exception is warranted.  *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).  And she has not done so; M.S.'s long-term needs outweigh the hardships of termination.  We decline to apply a permissive exception to save the parent-child relationship.

We affirm the termination of the mother's parental rights to M.S.

**AFFIRMED.**